# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59085-9-II |
| Respondent, | |
| v. | |
| LELDON ROY OVECHKA, | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, A.C.J. — Leldon R. Ovechka was charged with numerous offenses committed over the course of several months. A jury ultimately found him guilty of four counts of attempted murder in the first degree, two counts of unlawful possession of a firearm in the first degree, stalking, two counts of assault in the second degree, attempted residential burglary, intimidating a witness, three counts of felony harassment, assault in the fourth degree, four counts of violation of a no-contact order, and obstructing a law enforcement officer. On appeal, Ovechka argues there was insufficient evidence to support his four attempted murder in the first degree convictions. He further argues that the trial court erred when it denied Ovechka's motion to suppress texts he sent to a crisis negotiator before Ovechka was advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). We affirm Ovechka's convictions.

## FACTS

Ovechka and Jeanne Polum met in 2017. The two moved in together later that year.

I.    MARCH 2021 INCIDENTS

On March 8, 2021, Polum called the police to report that Ovechka pointed a gun at her, threatened to kill her, and assaulted her.  Polum reported that she and Ovechka had been fighting that day, so she decided to leave the house to let Ovechka calm down.  As she was leaving, Ovechka threw two bottles of air freshener that struck her side and back.  When Polum threatened to call the police, Ovechka responded that he would "unload his whole clip" and kill her.  9 Rep. of Proc. (RP) at 1200.  Ovechka then threw a metal water bottle, hitting Polum in the arm.

Polum left the house and called the police.  Pierce County Sheriff's Deputy Jason Bray contacted Polum who appeared scared and nervous.  Polum told Bray that Ovechka had pointed a gun at her.  She recalled that the gun had a red laser.

While talking with Bray, Polum received a call from Ovechka.  Polum put Ovechka on speaker and Bray heard him say that "he was ready to die" several times.  6 RP at 659.  Polum left the residence and Ovechka stayed at the home.

On March 10, police returned to Polum's residence in a marked police vehicle and observed Ovechka in the front yard.  Police parked in the driveway and Ovechka began to move toward the home.  Police ordered Ovechka to stop, but he continued into the home and barricaded himself inside.

Detective Sergeant Alexa Moss, a negotiator for the Special Weapons and Tactics (SWAT) team, was called out to assist with encouraging Ovechka to exit the home.  Moss was able to communicate with Ovechka via text message.  She told Ovechka she wanted to talk to him and hear his side of the story.  He responded that he was sick.  Moss acknowledged Ovechka was sick but advised him that the police could not leave.  She told Ovechka he was "under arrest" but she wanted to get his side of the story.  Clerk's Papers (CP) at 118.  Ovechka asked if he needed a

2

lawyer and Moss informed him that he "definitely [had] that right," but they were in the process of obtaining a warrant to search the house and he needed to exit the home. CP at 119.

Moss explained that because there were allegations of domestic violence, the police were required to make an arrest. Ovechka asked, "What domestic violence?" CP at 120. Moss explained the Polum alleged that he pointed a gun at her. Ovechka denied pointing a gun at Polum and stated, "[l]ast night . . . we were all here just watching Raya and the last dragon." CP at 121. Moss again explained to Ovechka that Washington's domestic violence laws are strict but that arresting someone does not necessarily mean the person will be charged. Ovechka stated that she was scaring him, that there were no guns, and asked her several times to call Polum. Moss told Ovechka that "[i]t sounds like you really care about [Polum] and the girls" and asked if they all lived there with him. CP at 128. Ovechka responded "We all live here . . . [w]ith 7 dogs." CP at 129.

Ovechka eventually exited the home. Ovechka told the police that he did not have a gun. After obtaining a search warrant, police searched the home and located numerous boxes of ammunition belonging to different types of firearms and two shell casings. The police arrested Ovechka.

Polum obtained a no-contact order on March 11, 2021, prohibiting Ovechka from having any contact with her for five years. Polum and Ovechka reconciled and continued to live together despite the no-contact order.

II.    NOVEMBER 2021 INCIDENTS

On November 16, 2021, Polum called the police to report that she and Ovechka got into another fight. As Polum left the home, Ovechka followed her outside. He smashed her work vehicle's window with a hammer. The two began exchanging numerous texts, with Ovechka

3

stating, "I can no longer tolerate listening to you anymore. I won't—I will shut you up permanently." 9 RP at 1229-30.

On November 17, Polum's daughter called 911 to report that Ovechka was trying to get into Polum's house. The daughter stated that she had been on the phone with her mother when she heard her mother's voice turn to panic. Polum told her daughter that she just heard the door handle jiggle and saw Ovechka outside the window. Police arrived but were unable to locate Ovechka that night.

Ovechka was upset with Polum for calling the police. He stated, "You've got all these sheriffs rolling around here I see . . . I promise it's not stopping anything." 7 RP at 935. He also told her, " You know I hate jail. . . . Game over for you, [Polum]." 7 RP at 935, 937.

On November 19, police were dispatched to Polum's daughter's elementary school for a no-contact order violation. Polum was in her car waiting to pick up her daughter when she noticed Ovechka in his car nearby. He texted her, "I'm going to fucking kill you if you don't make this right, man. You're [leaving] me no choice. I'm not going to fucking jail, man. I'm not losing my shit." 10 RP at 1298. Ovechka threatened, "I'm going to fucking kill everybody if you don't drop the charges." 8 RP at 1021.

On November 20, Ovechka was spotted in the parking lot of Polum's work. Ovechka continued to text threatening messages to Polum, including telling her, "When I see you next . . . one to the head, and you know I'm an excellent shot." 8 RP at 1037. Ovechka also told Polum she needed to retract her statements to the police or he would "take it out on them first because I keep seeing them. . . . Plus I'm pretty damn sure that they're all snitches like you and would love to fucking show up in court to lie and testify against me. . . . Turning myself in is definitely going to be the last resort." 8 RP at 1053, 1058.

4

On November 21, Ovechka continued to text Polum, telling her he would "kill before [he went] to jail." 8 RP at 1075. Later that afternoon, Polum was leaving the grocery store and observed Ovechka in the parking lot. Ovechka accelerated to keep up with her, and when he got behind her, she "saw the red light thing again." 10 RP at 1285.

Polum drove to a police precinct and reported what happened. Ovechka's final text to Polum stated, "I'm throwing all pieces on the floor and flipping the table over. Everybody loses. Fuck this game." 9 RP at 1102.

Pierce County Sheriff's Deputies Kevin Pressel and Andrew Oney located Ovechka driving in his vehicle and attempted to stop him. Ovechka led them on a high-speed chase before fleeing into the woods with a gun. Pressel and Oney waited for a K9 unit to arrive before attempting to locate Ovechka on foot. Pierce County Sheriff's Deputies Isaac Finch and Levi Redding responded with a K9. Before beginning the K9 track, Finch yelled, "This is the Pierce County Sheriff's Department. The area is going to be searched by a K9. Make yourself known. He will find you and he will bite you." 11 RP at 1555. Finch gave this announcement twice, but Ovechka did not respond.

It was nighttime, but there was some light from the patrol cars and neighboring houses. The deputies chose not to use flashlights in the woods in fear of disclosing their location to Ovechka, but they could not mask the sound of walking in the woods. The sound made it "[v]ery obvious" they were in the woods. 14 RP at 1926.

Approximately 20 minutes passed from the time Ovechka entered the woods to the time the police entered. They walked approximately 30 yards into the woods when they came to a slight hill, at which point they saw a red laser shine in their direction. The laser moved back and forth

initially, then shone directly at the deputies. Finch believed the laser was coming from an aiming device.

A "volley of gunfire" rang out. 16 RP at 2249. Finch heard the whiz of a bullet next to the right side of his face, which loudly struck a tree approximately 10 feet behind him. Finch heard multiple gun shots that were "[v]ery loud" and "very close." 11 RP at 1574. Redding testified that he heard bullets whiz past his head at close range. Redding believed the shots were coming from about 20 yards ahead of him.

After the gun shots, Finch and Oney heard someone crashing through the woods and rustling in the bushes for a couple of seconds, and then silence. The deputies remained on the ground until they determined it was safe to move. All four of the deputies feared they were going to die that night.

Police later located Ovechka in the woods at the bottom of a ravine. They ordered Ovechka to show his hands, but he did not respond. Police released the K9 to make contact with Ovechka before the rest of the officers approached him. The K9 bit Ovechka on the right side of his head. Police then removed him from the woods. When police got Ovechka to an ambulance, they observed that his right ear was partially amputated. Ovechka claimed he "shot" himself. 10 RP at 1398. Medics transported Ovechka to the hospital.

Police investigated the area of the shooting and observed a slight hill that descended into a steep drop off on the other side, creating "a perfect area to hide." 12 RP at 1661. The position was advantageous because it was "a position of cover" with "a pretty good line of sight." 12 RP at 1662. At that location, police found a pistol and a shell casing. The magazine was inserted in the pistol, and the slide was locked to the rear, indicating that the shooter shot the gun until there was no more ammunition left.

III.    CHARGES

The State charged Ovechka with four counts of attempted murder in the first degree, four counts of assault in the first degree, two counts of unlawful possession of a firearm in the first degree, one count of stalking, two counts of assault in the second degree, one count of residential burglary, one count of intimidating a witness, three counts of felony harassment, one count of assault in the fourth degree, four counts of violation of a no-contact order, and one count of obstructing a law enforcement officer.

IV.    PRE-TRIAL CrR 3.5 HEARING

Prior to trial, Ovechka argued that the text messages between himself and Moss from the March 10, 2021 incident should be excluded because the texts were made without a *Miranda* warning.

At the hearing on the admissibility of the texts, Moss testified that her role on March 10, 2021, was as a crisis negotiator. In that role, she would communicate with an individual to get them to come out of the house that they are barricaded in, or put down the weapon that they are armed with. To achieve these goals, she attempts to build rapport. Moss explained that in this role she risks losing rapport if she reads the individual their *Miranda* warnings because "it can make them not trust you, and not be willing to engage in that conversation with you." 2 RP at 52.

Moss testified that her goal on March 10, 2021, was to build rapport with Ovechka to convince him to come out of the house. She was not there to investigate a domestic violence assault but rather to "try to get Mr. Ovechka to come out of the house so that we can arrest him without any further incidents, without him getting hurt and without any of the officers on scene getting hurt." 2 RP at 55. Moss was especially careful because she was communicating via text message, making it harder to determine Ovechka's emotional state. Given her belief there was a

7

firearm in the house, Moss was concerned that Ovechka would attempt to take his own life. Moss testified that she believed that if she had advised Ovechka of his *Miranda* rights, he may have become violent, stopped talking to her, or refused to come out of the house.

The trial court found that although Ovechka was not free to leave when he texted Moss, his statements were admissible under the public safety exception to the *Miranda* requirement. Relevant to this appeal, the court specifically found that Moss's "role was not to investigate a crime" and that "[r]eading [Ovechka] his *Miranda* warnings would have increased the risk of a violent outcome." CP at 1043-44 (Findings of Fact (FF) 100 and 109). The court also found that reading the warnings would have damaged Moss's "goal of changing [Ovechka's] behavior. CP at 1044 (FF 110)

The trial court concluded that Ovechka was not in custody when he communicated with Moss. It also concluded no *Miranda* warnings were required. The court further concluded that Moss's negotiations "fell within the public safety exception to the *Miranda* requirement," "[t]here was an objectively reasonable need to protect the police or the public," and "[a]dvising [Ovechka] of his *Miranda* warnings would have escalated the situation." CP at 1051 (Conclusions of Law (CL) 21, 22, and 23). The court also conclude that "the public safety exception applies to [Ovechka's] March 10, 2021, statements via text message in the negotiations with [Moss]." CP at 1052 (CL 35).

The trial court admitted the statements.

IV. TRIAL

Witnesses testified to the above facts at trial. The text messages between Moss and Ovechka were admitted at trial, as well as the text message between Polum and Ovechka.

Polum recanted at trial and claimed that Ovechka never pointed a gun at her, yet she acknowledged there was a gun in the closet and ammunition in the house.

Dr. Paul Inouye, who examined Ovechka after he was removed from the woods, testified that the wound on the back of Ovechka's head was a dog bite wound. Inouye testified there was no indication that Ovechka had suffered a gunshot wound.

Ovechka testified in his defense. He claimed that on November 21, 2021, "I put the gun to my head, I pulled the trigger and it clicked, like, two times, so I racked it back. I shot a couple of times just to make sure that it was working, and then I put it to the back of my head and pulled the trigger." 17 RP at 2370-71.

Ovechka testified that he was standing up when he shot himself. He said he "felt the bullet enter my head and I felt blood trickling down, and I fell straight to the ground because I thought I was dead." 17 RP at 2379. Ovechka claimed he laid there for what "seem[ed] like an hour" then started running. 17 RP at 2379. He claimed he "heard a voice that said run to me, so I just got up and I started running. And then all of a sudden I was flying, and that's the last thing I remember." 17 RP at 2380. Ovechka testified that he had no recollection of what happened from the time he fell into the ravine to when he woke up in the hospital.

On cross-examination, Ovechka admitted that he knew police officers were present when he entered the woods with a firearm and that he heard the deputies give K9 announcements ordering him to come out. Ovechka testified that he wanted to shoot himself in the back of his head.

## V. JURY VERDICT

The jury found Ovechka guilty as charged, with the exception of count XIV (residential burglary), which resulted in a conviction for the lesser offense of attempted residential burglary.

9

The court vacated the four assault in the first degree convictions on double jeopardy grounds, and sentenced Ovechka on the remaining convictions.

Ovechka appeals.

## ANALYSIS

I.    SUFFICIENCY OF EVIDENCE OF ATTEMPTED MURDER IN THE FIRST DEGREE

Ovechka contends that the State failed to provide sufficient evidence to support his four attempted murder in the first degree convictions. He argues that the State failed to prove premeditation and intent to kill. Viewing the evidence in the light most favorable to the State, we disagree.

The State must prove all elements of a charged crime beyond a reasonable doubt. *State v. Larson*, 184 Wn.2d 843, 854, 365 P.3d 740 (2015). A defendant who contests the sufficiency of the evidence admits the truth of the State's evidence and all reasonable inferences drawn from that evidence. *State v. Trey M.*, 186 Wn.2d 884, 905, 383 P.3d 474 (2016). Circumstantial evidence and direct evidence are equally reliable. *State v. Farnsworth*, 185 Wn.2d 768, 775, 374 P.3d 1152 (2016).

When reviewing a claim of insufficient evidence, we do not "reweigh the evidence and substitute our judgment for that of the jury." *State v. McCreven*, 170 Wn. App. 444, 477, 284 P.3d 793 (2012). Rather, because the jury "observed the witnesses testify firsthand, we defer to the jury's resolution of conflicting testimony, evaluation of witness credibility, and decisions regarding the persuasiveness and the appropriate weight to be given the evidence." *Id.*

Attempted murder in the first degree requires a substantial step toward committing murder in the first degree. RCW 9A.28.020(1). A person is guilty of murder in the first degree when he or she causes the death of another with the premeditated intent to kill. RCW 9A.32.030(1)(a).

Premeditation is "'the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short.'" *State v. Scherf*, 192 Wn.2d 350, 398, 429 P.3d 776 (2018) (quoting *State v. Bingham*, 105 Wn.2d 820, 823, 719 P.2d 109 (1986)); *State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995). "It is more than a moment in time." *Sherf*, 192 Wn.2d at 398. Our Supreme Court has held that there is sufficient evidence of premeditation where (1) there were multiple wounds, (2) the defendant brought a weapon to the murder site, (3) there was a sufficient lapse of time, (4) there was evidence of motive, and (5) there was planning and preparation. *Id*.

Intent to kill means the defendant acted with the purpose to cause death. *State v. Roberts*, 142 Wn.2d 471, 502, 14 P.3d 713 (2000); RCW 9A.32.030(1)(a). "When intent is an element of the crime, 'intent to commit a crime may be inferred if the defendant's conduct and surrounding facts and circumstances plainly indicate such an intent as a matter of logical probability.'" *State v. Vasquez*, 178 Wn.2d 1, 8, 309 P.3d 318 (2013) (quoting *State v. Woods*, 63 Wn. App. 588, 591, 821 P.2d 1235 (1991)).

A.      Premeditation

The evidence shows Ovechka sent several text messages to Polum expressing that he was willing to kill to avoid returning to jail. He specifically identified law enforcement as targets, stating he would "take it out on them first" and calling them "snitches." 8 RP at 1053. Additionally, Ovechka intentionally brought a firearm and ammunition into the woods after fleeing from a high-speed chase. Approximately 20 minutes passed from the time Ovechka entered the woods until the deputies began their track. This provided a sufficient window for Ovechka to deliberate and weigh his actions. Further, Ovechka did not merely hide; he positioned himself on a slight hill that created "a position of cover" with a "pretty good line of sight" toward the

approaching deputies. 12 RP at 1662. This suggests a calculated ambush rather than a spontaneous act. Additionally, Ovechka moved the laser back and forth initially and then shone it directly at the deputies, which suggests he was in fact aiming the firearm. Accordingly, the State presented sufficient evidence that Ovechka acted with premeditation.

### B.      Intent to Kill

Intent to kill may be inferred from conduct and surrounding circumstances. *Vasquez*, 178 Wn.2d at 8. Here, deputies observed a red laser, identified as an aiming device, shining directly at them before the gunfire began. Polum confirmed that Ovechka had a red laser on his gun.

Ovechka also had lethal proximity. He fired a "volley of gunfire." 16 RP at 2249. Deputies Finch and Redding testified that bullets whizzed past their faces and heads at close range, with one bullet striking a tree only 10 feet behind Finch. Ovechka told Polum he was an excellent shot and threatened "one to the head." 8 RP at 1037. Ovechka also fired until the gun's slide was locked to the rear, indicating Ovechka fired until his ammunition was completely exhausted.

While Ovechka testified that he only intended to shoot himself, the jury was entitled to find this testimony not credible. *McCreven*, 170 Wn. App. at 477. This is particularly true given the medical testimony that Ovechka's injury was a dog bite rather than a gunshot wound. And there was testimony of a laser being pointed at the deputies. Accordingly, the State provided sufficient evidence that Ovechka had the intent to kill.

Because the evidence supports a finding that Ovechka took a substantial step toward causing the death of the four deputies with premeditated intent, the State provided sufficient evidence for the attempted murder in the first degree convictions.

II.     ADMISSIBILITY OF TEXT MESSAGES

Ovechka next contends that the trial court erred in admitting the March 10, 2021 text messages between him and Moss because he was not provided with *Miranda* warnings before Moss began texting him.

The decision whether to admit evidence is left to the trial court's sound discretion. *State v. Jennings*, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022).  Discretion is abused when the trial court's decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons. *Id.*  When reviewing a trial court's CrR 3.5 findings of fact and conclusions of law, we determine whether substantial evidence supports the court's findings of fact and whether the findings of fact support the court's conclusions of law.  *State v. Russell*, 180 Wn.2d 860, 866, 330 P.3d 151 (2014).  "'Evidence is substantial when it is enough to persuade a fair-minded person of the truth of the stated premise.'"  *Id.* at 866-67 (internal quotation marks omitted) (quoting *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009)).  We review conclusions of law de novo.  *Russell*, 180 Wn.2d at 867.

*Miranda* warnings must be given "when a suspect endures (1) custodial (2) interrogation (3) by an agent of the State."  *State v. Heritage*, 152 Wn.2d 210, 214, 95 P.3d 345 (2004).  A person is in custody if "a reasonable person in the suspect's position would have felt that his or her freedom was curtailed to the degree associated with a formal arrest."  *Id.* at 218.  An interrogation occurs when "under all of the circumstances involved in a given case, the questions are reasonably likely to elicit an incriminating response from the suspect."  *State v. Bradley*, 105 Wn.2d 898, 903-04, 719 P.2d 546 (1986).

Police may question a suspect prior to giving *Miranda* warnings "if (1) the question is solely for the purpose of officer or public safety, and (2) the circumstances are sufficiently urgent

to warrant an immediate question." *State v. Spotted Elk*, 109 Wn. App. 253, 260, 34 P.3d 906 (2001). "If both conditions are met, the question does not constitute an interrogation in violation of *Miranda*." *Id*.

In *State v. Finch*, 137 Wn.2d 792, 828-30, 975 P.2d 967 (1999), our Supreme Court held that police negotiations with barricaded suspects fall within the public safety exception to the *Miranda* requirement. In *Finch*, the defendant shot and killed two people, one of whom was a police officer. Finch barricaded himself in a trailer and indicated an intent to shoot other police officers. *Id*. at 830. Finch then fired two or three more shots from the trailer and told a negotiator over the phone "that he could see a 'guy by a tree' and was 'fixing to fire' at him." *Id*. Finch also "indicated that he was suicidal and that he had a self-inflicted gunshot wound in his foot and another to his shoulder." *Id.*

In assessing whether the public safety exception to the *Miranda* requirement applied, our Supreme Court held that establishing communication with an armed and barricaded suspect is important to calm the suspect and to help the police to control the volatile situation. *Id*. Communication also "distracts the defendant and makes injury less likely." *Id.* The Court held that "[a]n objectively reasonable need to protect the police and the [d]efendant from immediate danger existed in this case and thus *Miranda* warnings were not required." *Id.*

Here, Moss testified at the CrR 3.5 hearing that she was a crisis negotiator with the SWAT team and was called in to encourage Ovechka to exit the home without hurting himself or others. She was not there as an investigator.

Moss testified to the importance of building rapport. She explained that in her role, she risks losing rapport if she reads the individual their *Miranda* warnings because "it can make them not trust you, and not be willing to engage in that conversation with you." 2 RP at 52. Moss was

especially careful because she was communicating via text message, making it harder to determine Ovechka's emotional state. Given her belief there was a firearm in the house, Moss was concerned that Ovechka would attempt to take his own life. Moss testified that she believed that if she had advised Ovechka of his *Miranda* rights, he may have become violent, stopped talking to her, or refused to come out of the house. Her primary tool for changing Ovechka's behavior (i.e., getting him to exit the home without hurting himself or others) was building rapport. She believed providing *Miranda* warnings would have likely caused Ovechka to stop talking to her or refuse to come out of the house entirely.

This testimony provided substantial evidence to support the challenged findings of fact that Moss's role was not to investigate a crime and that reading Ovechka his *Miranda* warnings would have increased the risk of a violent outcome and undermine Moss's goal of changing Ovechka's behavior.

Based on the trial court's findings of fact and our Supreme Court's guidance in *Finch*, the trial court did not err in concluding that *Miranda* warnings were not required. The court further properly concluded that Moss's negotiations "fell within the public safety exception to the *Miranda* requirement," "[t]here was an objectively reasonable need to protect the police or the public," and "[a]dvising [Ovechka] of his *Miranda* warnings would have escalated the situation."[1] CP at 1051 (CL 21, 22, and 23). The court also correctly concluded that "the public safety exception applies to [Ovechka's] March 10, 2021, statements via text message in the negotiations with [Moss]." CP at 1052 (CL 35). Accordingly, the court did not err in admitting Ovechka's texts to Moss.

---

[1] Based on this holding, it is immaterial whether the trial court properly concluded Ovechka was in custody.

15

CONCLUSION

We hold that the State presented sufficient evidence to support Ovechka's four attempted murder in the first degree convictions and the trial court did not err in allowing the text messages between Ovechka and Moss. Accordingly, we affirm Ovechka's convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, A.C.J.

We concur:

_____
Maxa, J.

_____
Glasgow, J.